**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **PAULINA F. ZUNINO, DMD, LLC,** on behalf of itself and all others similarly situated,<br><br>                              **Plaintiff,**<br><br>    **vs.**<br><br>**THE HARTFORD FINANCIAL SERVICES GROUP, INC.; and SENTINEL INSURANCE COMPANY, LTD.,**<br><br>                              **Defendants.** | **Case No.** _2:20-cv-1260_____ |

**CLASS ACTION COMPLAINT**

Plaintiff, PAULINA F. ZUNINO, DMD, LLC ("Plaintiff") brings this Class Action Complaint, on behalf of itself and all others similarly situated (the "Class"), against Defendants, THE HARTFORD FINANCIAL SERVICES GROUP, INC., and SENTINEL INSURANCE COMPANY, LTD. (collectively, "Insurers" or "Defendants"), alleging as follows:

**NATURE OF THE CASE**

1.      This is a civil class action for declaratory relief and breach of contract arising from Plaintiff's contract of insurance with the Defendants.

2.      At the direction of local, state, and/or federal authorities, and/or due to the COVID-19 public health emergency, Plaintiff was forced to temporarily close her dental office beginning on March 13, 2020, causing an interruption to and loss of Plaintiff's business income.

3.      Plaintiff and the Class purchased and paid for an "all-risk" Commercial Property Coverage insurance policy from Defendants, which provides broad property insurance coverage for all non-excluded, lost business income, including the losses asserted herein.

4.    Plaintiff submitted timely notice of its claim to Defendants, but Defendants have refused to provide the purchased coverage to its insured, and have denied Plaintiff's claim for benefits under the policy.

5.    Defendants have similarly refused to, or will refuse to, honor its obligations under the "all-risk" policy(ies) purchased by Plaintiff and the other members of the putative Class of insureds.

## PARTIES

6.    Plaintiff, PAULINA F. ZUNINO, DMD, LLC is limited liability company incorporated in, and a citizen of, the Commonwealth of Pennsylvania.  Plaintiff is a licensed dental office, with its principal office location at 620 Beaver Street, Sewickley, Pennsylvania 15143 ("Covered Property").

7.    Defendant, Hartford Financial Services Group, Inc. is a Delaware corporation with its principal place of business in Hartford, Connecticut, and is a citizen of Connecticut. It owns subsidiaries, directly and indirectly, that issue, *inter alia*, commercial property insurance.

8.    Defendant, Sentinel Insurance Company, Ltd., is a Connecticut corporation with its principal place of business in Hartford, Connecticut, and is a citizen of Connecticut. It is a subsidiary of Hartford Financial Services Group, Inc. and a member of The Hartford group of insurance companies.

## JURISDICTION

9.    This court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d), the Class Action Fairness Act, which affords federal courts with original jurisdiction over cases where any member of the plaintiff class is a citizen of a state different from any defendant (*i.e.,* so-called "minimum diversity of citizenship,") and where the amount in controversy exceeds

$5,000,000, exclusive of interest and costs. Here, there exists minimal diversity of citizenship because Plaintiff (and some members of the Class) and Defendants are citizens of different states, and the aggregated claims of the putative Class members exceed $5,000,000, exclusive of interest and costs.

10.     The Court has personal jurisdiction over Defendants because at all relevant times they have engaged in substantial business activities in Pennsylvania.  Defendants have, at all relevant times, transacted, solicited, and conducted business in Pennsylvania through its employees, agents, and/or sales representatives, and derived substantial revenue from such business in Pennsylvania.

11.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2)  because a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated, in this district.

## FACTUAL BACKGROUND

### Plaintiff Purchased an "All-Risk" Policy of Property Insurance That Broadly Provides Coverage for Loss of Business Income, Among Other Things

12.     Plaintiff purchased a contract of insurance from Defendants, whereby Plaintiff agreed to make payments (in the form of premiums) to Defendants in exchange for Defendants' promise to indemnify Plaintiff for losses at the Covered Property, including, but not limited to, business income losses.

13.     Plaintiff's contract of insurance with Defendants bears Policy Number 39SBWUL0017 (the "Policy") and is effective for the period of November 1, 2019 November 1, 2020 (the "Policy Term").  The Policy is attached hereto as **Exhibit A**.

14.     Plaintiff paid all premiums owed to Defendants under the Policy, and Defendants accepted all such premiums from Plaintiff.

15.     The Policy is a form policy issued by Defendants.

16.     The Policy is an "all-risk" policy, which provides the broadest property insurance coverage available.

17.     The Policy provides coverage for "direct physical loss of or physical damage to Covered Property at the premises described in the Declarations . . .  caused by or resulting from a Covered Cause of Loss."

18.     The premises described in the Declarations of the Policy is the Covered Property.

19.     The Policy defines "Covered Cause of Loss" as "RISKS OF DIRECT PHYSICAL LOSS unless the loss is: a. Excluded . . . or Limited [under the Policy]."

20.     The Policy does not define the phrase "direct physical loss of or physical damage to."

21.     However, the use of the disjunctive "or" in the phrase "direct physical loss of or physical damage to" means that coverage is triggered if either a physical loss of property or physical damage to property occurs.   The concepts are separate and distinct and cannot be conflated.

22.     Physical loss of, or physical damage to, property may be reasonably interpreted to occur when a covered cause of loss threatens or renders property unusable or unsuitable for its intended purpose or unsafe for ordinary human occupancy and/or continued use.

23.     The Policy provides Plaintiff with, *inter alia*, various business income and extra expense coverages during the Policy Term.

24.     Under the Policy, Defendants agree to pay for the actual loss of Business Income sustained due to the necessary suspension of operations during the period of restoration. "The suspension must be caused by direct physical loss of or physical damage to property at the

"scheduled premises." The Policy describes the scheduled premises as "620 Beaver Street, Sewickley, Pennsylvania 15143," the Covered Property.

25.    Additional coverage is provided under the Policy for business income losses resulting from an "order of a civil authority" which prohibits access to the Covered Property, related to a "Covered Cause of Loss" at property in the immediate area of the Covered Property.

26.    The Policy also provides coverage for "actual loss of Business Income you sustain due to direct physical loss or physical damage at the premises of a dependent property caused by or resulting from a Covered Cause of Loss." Dependent property is defined as "property owned, leased or operated by others whom you depend on to: a) Deliver materials or services to you . . . b) Accept your products or services; c) Manufacture your products for delivery to your customers under contract of sale; or d) Attract customers to your business premises."

27.    Members of the Class also purchased a policy of insurance from Defendants providing for the same business income loss coverage and using the same form policy provisions.

**In Response to Covid-19, Pennsylvania and Other State Governments Issue Sweeping Orders Shutting Down "Non-Essential" Businesses**

28.    COVID-19 has spread, and continues to spread, rapidly across the United States and has been declared a public health emergency of international concern by the World Health Organization. *See* https://www.health.harvard.edu/diseases-and-conditions/coronavirus-resource-center (last accessed May 6, 2020).

29.    COVID-19 is highly contagious and can be spread exponentially in the community by persons who are symptomatic, asymptomatic or pre-symptomatic. In addition to transmission through airborne respiratory droplets, the COVID-19 virus can physically attach to and stay on surfaces of objects or materials for many days.

30.    According to a study published in *The New England Journal of Medicine*, COVID-19 is widely accepted as a cause of real physical loss and damage. It remains stable and transmittable in aerosols for up to three hours, and on surfaces for up to four hours on copper, up to 24 hours on cardboard and up to two to three days on plastic and stainless steel. *See* https://www.nih.gov/news-events/news-releases/new-coronavirus-stable-hours-surfaces    (last accessed May 6, 2020).

31.    Another study, published in the *Journal of Hospital Infection*, found: "Human coronaviruses can remain infectious on inanimate surfaces at room temperature for up to 9 days. At a temperature of 30°C or more the duration of persistence is shorter." *See* https://www.inverse.com/science/coronavirus-4-studies-explain-how-covid-19-sticks-to-surfaces (last accessed May 6, 2020).

32.    With respect to dentistry practices, like Plaintiff's business, COVID-19 poses a particular threat.   Most procedures performed by dentists have the potential for creating contaminated aerosols and splatter. Journal of Clinical & Diagnostic Research, *Aerosols How Dangerous They Are in Clinical Practice*, (April 1, 2015), available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4437160/.   The creation of aerosols in dentistry is of even greater concern with COVID-19:  "First, higher viral loads have been detected in nasal passages and the upper respiratory tract of individuals infected with [COVID-19], which mean coughs and sneezes may contain higher viral loads than its predecessor virus. Second, the potential for individuals infected with [COVID-19] to shed and transmit the virus while asymptomatic is much greater, and those in the latent stages of the disease often shed the virus at a higher rate. Third—and most significantly—this new virus strain has been shown to be much more efficient at traveling more considerable distances and becoming aerosolized." Perio-Implant

Advisory, *COVID-19 and the problem with dental aerosols* (April 7, 2020), available at
https://www.perioimplantadvisory.com/periodontics/oral-medicine-anesthetics-and-oral-
systemic-connection/article/14173521/covid19-and-the-problem-with-dental-aerosols.

33.     In response to the COVID-19 public health emergency, on March 6, 2020, the
Governor of Pennsylvania declared a "Disaster Emergency" throughout the Commonwealth of
Pennsylvania to control ingress and egress to and from property within the Commonwealth and
the movement of persons within it.

34.     On March 16, 2020 the American Dental Association ("ADA") "recognizing the
unprecedented and extraordinary circumstances dentists and all health care professionals face
related to growing concern over COVID-19" issued a recommendation that dentists nationwide
postpone elective procedures.

35.     Thereafter, on March 19, 2020, the Governor of Pennsylvania issued an Executive
Order closing all non-essential businesses within the Commonwealth, including Plaintiff's
business. Specifically, the Executive Order, which became effective immediately upon its
issuance, mandated that:

> No person or entity shall operate a place of business in the Commonwealth that is not a
> life sustaining business regardless of whether the business is open to members of the
> public.

Governor Wolf, "Order of the Governor of the Commonwealth of  Pennsylvania  Regarding  the
Closure   of   All   Businesses   that   are   not   Life   Sustaining,"   (Mar.   19,   2020)
https://www.governor.pa.gov/wp-content/uploads/2020/03/20200319-TWW-COVID-19-
business-closure-order.pdf ("Executive Order").

36.    On March 19, 2020 the Secretary of the Pennsylvania Department of Health, consistent with the Governor's Executor Order, also issued an order that no person operate a place of business that is not life-sustaining within the Commonwealth.

37.    Also, on March 19, 2020, the Small Business Administration issued Disaster Declaration #16360 issuing a Declaration of an Economic Injury Disaster for the entire Commonwealth of Pennsylvania.

38.    On March 22, 2020 the Secretary of the Pennsylvania Department of Health issued "Guidance on COVID-19 for Dental Health Care Personnel in Pennsylvania" (the "DOH March 22nd Guidance") directing that all dental facilities immediately cease all treatment until further notice except for urgent and emergency procedures.

39.    The DOH March 22nd Guidance noted that most dental facilities would not be able to meet stringent infection protection and control requirements needed to remain open including, but not limited to, personal protection equipment ("PPE"), N95 masks, face-shields covering face and sides, disposable gowns and gloves and engineering controls such as negative pressure isolation rooms with HEPA filtration.

40.    On March 23, 2020, the Governor of Pennsylvania issued a "Stay at Home" Order to certain counties in Pennsylvania (the "Governor's Stay at Home Order"), to take effect at 8:00 p.m. on March 23, 2020 severely limiting an individual's ability to leave their residence. The Governor's Stay at Home Order was amended April 1, 2020 to apply to the entire Commonwealth of Pennsylvania, effective immediately.

41.    The DOH March 22nd Guidance was amended on March 26, 2020 (the "DOH March 26th Guidance") which again directed all dental facilities to cease all elective dental

procedures and to only treat urgent and emergency patients if the facilities were able to meet certain stringent infection and control requirements.

42.    On May 8, 2020 the DOH March 26th Guidance was amended to remove the absolute prohibition against elective or non-urgent dental procedures (the "DOH May 8[th] Guidance"). The DOH May 8th Guidance, however, discouraged dental procedures that created visible spray or aerosol permitting such procedures only as a "last resort" if clinically necessary to prevent irreversible damage to the patient and only when proper PPE, per OSHA guidance, was available to the dental practice. The DOH May 8th Guidance further noted that the Pennsylvania Department of Health and Pennsylvania Department of Emergency Services were not prioritizing dental practices for PPE distribution and that "[I]f infection control protocols outlined by the CDC and OSHA cannot be followed, the procedure should not be done."

43.    On May 8, 2020, the Governor of Pennsylvania announced a plan to reopen certain counties within the Commonwealth, transitioning certain counties to "yellow", which allows low-risk businesses such as Plaintiff's to open. Allegheny County, where Plaintiff's business is located, was moved to "yellow" on May 15.[1]

44.    Most other states, including those in which the putative Class members reside and/or do business, have issued similar compulsory shut-down orders for "non-essential" businesses, or businesses deemed not to be "life sustaining." Most other states, including those in which the putative Class members reside and/or do business, have also issued directives from public health officials curtailing non-urgent or non-emergent health care services.

45.    Due to an increase in COVID-19 cases, on July 15, 2020, Governor Wolf issued an Order Directing Targeted Mitigation Measures, reinstating certain restrictions on certain

---

[1] https://www.publicsource.org/allegheny-yellow-phase-news/#:~:text=Gov.,said%20at%20a%20press%20conference.

businesses.[2] This Order mandated that all businesses are required to conduct their operations remotely, "[u]nless not possible."[3] There is no expiration date on this Order.

46.    The closure of all "non-life-sustaining businesses" evidences an awareness on the part of both state and local governments that COVID-19 causes loss of or damage to property.  This is particularly true in places where in-person business is conducted, as the contact and interaction necessarily incident to such businesses causes a heightened risk of the property becoming contaminated.

47.    For example, a New York City Executive Order entered on March 16, 2020 specifically acknowledged that: "[COVID-19] physically is causing property loss and damage." *See*  https://www1.nyc.gov/assets/home/downloads/pdf/executive-orders/2020/eeo-100.pdf  (last accessed May 6, 2020).

48.    Similarly, in a March 16, 2020 proclamation, the City of New Orleans acknowledged COVID-19's "propensity to attach to surfaces for prolonged periods of time, thereby spreading from surface to person and causing property loss and damage in certain circumstances." *See* https://nola.gov/mayor/executive-orders/emergency-declarations/03162020-mayoral-proclamation-to-promulgate-emergency-orders-during-the-state-of-emergency-due-to-co/ (last accessed May 6, 2020).

49.    In upholding the Governor of Pennsylvania's Proclamation of a state-wide disaster and the Executive Orders mandating the closure of businesses within Pennsylvania, the Pennsylvania Supreme Court noted the significant risk of the spread of the COVID-19 virus, even in locations where the disease has not been detected:

>        Covid-19 does not spread because the virus is "at" a particular location. Instead

---

[2] https://www.governor.pa.gov/wp-content/uploads/2020/07/20200715-TWW-targeted-mitigation-order.pdf
[3] *Id.*

it spreads because of person-to-person contact, as it has an incubation period of up to fourteen days and that one in four carriers of the virus are asymptomatic. Respondents' Brief at 4 (citing Coronavirus Disease 2019, "Symptoms," CDC, https://www.cdc.gov/coronavirus/2019-ncov/symptoms-testing/symptoms.html (last accessed 4/9/2020)). The virus can live on surfaces for up to four days and can remain in the air within confined areas and structures. *Id.* (citing National Institutes of Health, "Study suggests new coronavirus may remain on surfaces for days," (Mar. 27, 2020) https://www.nih.gov/news-events/nih-research-matters/study-suggests-new-coronavirus-may-remain-surfaces-days (last accessed 4/9/2020) and Joshua Rabinowitz and Caroline Bartman, "These Coronavirus Exposures Might be the Most Dangerous," The New York Times (Apr. 1, 2020) https://www.nytimes.com/2020/04/01/opinion/coronavirus-viral-dose.html).

*Friends of DeVito v. Wolf*, 227 A. 3d 872, 891 (Pa. 2020).

50.     Because the COVID-19 virus can survive on surfaces for up to fourteen days, the Pennsylvania Supreme Court ultimately concluded that "any location . . .  where two or more people can congregate is within the disaster area."

51.     Further, the World Health Organization ("WHO") has indicated that airborne transmission, "particularly in specific indoor locations, such as crowded and inadequately ventilated spaces" poses a significant risk.[4]  The WHO has also raised concerns about transmission of the virus through aerosol generating medical procedures and the creation of fomites (contaminated surfaces).[5]

52.     The CDC has warned that exposure to an individual with COVID-19 for fifteen minutes or more, or close contact within six feet of distance, is enough to justify a personal quarantine.[6]

---

[4] https://apnews.com/648feb226473f9841920abd6ffb004c7
[5] https://www.who.int/news-room/commentaries/detail/transmission-of-sars-cov-2-implications-for-infection-prevention-precautions/
[6] https://www.cdc.gov/coronavirus/2019-ncov/php/public-health-recommendations.html

53.    Experts believe that "a second wave" of COVID-19 cases will occur in the fall and winter of 2020, coinciding with the flu season. As Dr. Robert Glatter, emergency physician at Lenox Hill Hospital in New York City stated: "[the second wave] will likely be worse than the initial wave we experienced this spring."[7]

54.    Plaintiff has incurred, and continues to incur, among other things, a substantial loss of business income and additional expenses covered under the Policy.

### Plaintiff Submits a Claim Under Its "All-Risk" Policy, and Defendants Wrongly Fails and Refuses To Honor Its Obligations Respecting Same

55.    As a result of the orders, guidance and protocols issued by the Governor of Pennsylvania, the Secretary of the Pennsylvania Department of Health, the CDC, OSHA and the WHO relating to the Plaintiff's practice of dentistry (collectively the "**Mandated Shutdown Rules**"), the Covered Property effectively closed on March 13, 2020 for provision of elective dental procedures with limited re-opening as of June 1, 2020 to provide clinically necessary treatment in cases of non-urgent and non-emergent care.

56.    Plaintiff has incurred, and continues to incur, among other things, a substantial loss of business income, including additional expenses covered under the Policy due to the constraints to provide elective dental care to patients at the Covered Property because of the Mandated Shutdown Rules.

57.    On or about March 20, 2020 Plaintiff provided oral notice to Defendants of its claim for the interruption to its business.

58.    Defendants responded to Plaintiff with a letter, dated March 25, 2020 (attached hereto as **Exhibit B**), indicating, "the coronavirus did not cause property damage at your place of

---

[7] https://www.healthline.com/health-news/what-a-covid-19-wave-in-the-fall-could-look-like#Educated-guesses-about-the-future

business or in the immediate area . . . ." Further, Defendants state "[e]ven if the virus did cause damage, it is excluded from the policy, and the limited coverage available for losses caused by virus does not apply to the facts of your loss."

## Contrary To Defendants' Position, Plaintiff's Losses Arise From Direct Physical Loss Or Damage

59.    Plaintiff's Covered Property suffered direct physical loss or physical damage due to the Mandated Shutdown Rules requiring Plaintiff discontinue its primary use of the Covered Property.  The Mandated Shutdown Rules, in and of themselves, constitute a Covered Cause of Loss within the meaning of the Policy.

60.    Alternatively, and to the extent the Mandated Shutdown Rules do not constitute a Covered Cause of Loss within the meaning of the Policy, the COVID-19 public health emergency and the ubiquitous nature of the COVID-19 virus caused a direct physical loss or damage to Plaintiff's Covered Property. Specifically, the Covered Property has been rendered unusable for its intended purpose because the highly contagious nature of COVID-19 – particularly when people gather inside a building or other closed space for extended periods of time, or when aerosols are generated during medical procedures – precludes any meaningful use of the Covered Property. For example, in *Motorists Mutual Ins. Co. v. Hardinger*, 131 F. App'x 823 (3d Cir. 2005), the United States Court of Appeals for the Third Circuit held that an issue of fact existed as to whether the presence of Escherichia coli ("E. coli") at the covered property impacted its functionality, or made the property otherwise useless or uninhabitable, sufficient to establish physical loss or damage to the property.

61.    Further, and as an additional basis for coverage under the Policy, the ubiquitous nature of the COVID-19 virus, as explained above, caused direct physical loss or physical damage to property other than Plaintiff's Covered Property, and such loss or damage resulted in an "action

by civil authority" prohibiting access to Plaintiff's Covered Property, within the meaning of the Policy.

62.    Additionally, Plaintiff's "dependent property" suffered direct physical loss or physical damage as a result of the Mandatory Shutdown Rules, or in the alternative, the ubiquitous nature of the COVID-19 virus, resulting in lost business income to Plaintiff, within the meaning of the Policy.

### Contrary To Defendants' Position, The Virus Exclusion Does Not Apply

63.    The Policy contains a coverage exclusion for losses caused by "[p]resence, growth, proliferation, spread or any activity of 'fungi', wet rot, dry rot, bacteria or virus." (the "Virus Exclusion").

64.    The Virus Exclusion does not preclude coverage for Plaintiff's claim under the Policy.

65.    First, to the extent that the governmental orders, in and of themselves, constitute direct physical loss of or physical damage to Plaintiff's Covered Properties, the Virus Exclusion simply does not apply.

66.    Further, to the extent that the coverage under the Policy derives from direct physical loss or physical damage caused by the COVID-19 virus, either to Plaintiff's Covered Properties or to property other than Plaintiff's Covered Properties, Defendants should be estopped from enforcing the Virus Exclusion, on principles of regulatory estoppel, as well as general public policy.

67.    In 2006, two insurance industry trade groups, Insurance Services Office, Inc. ("ISO") and the American Association of Insurance Services ("AAIS"), represented hundreds of

insurers in a national effort to seek approval from state insurance regulators for the adoption of

various virus exclusion provisions.

68. In their filings with the various state regulators, on behalf of the insurers, ISO and

AAIS represented that the adoption of the virus exclusion provisions were only meant to "clarify"

that coverage for "disease-causing agents" has never been in effect, and was never intended to be

included, in the property policies.

69. Specifically, in its "ISO Circular" dated July 6, 2006 and entitled "New

Endorsements Filed to Address Exclusion of Loss Due to Virus or Bacteria," ISO represented to

the state regulatory bodies that:

> While property policies have not been a source of recovery for losses involving
> contamination by disease-causing agents, the specter of pandemic or hitherto
> unorthodox transmission of infectious material raises the concern that insurers
> employing such policies may face claims in which there are efforts to expand
> coverage to create sources of recovery for such losses, contrary to policy intent.

70. Similarly, AAIS, in its "Filing Memorandum" in support of the adoption of virus

exclusion provisions, represented:

> Property policies have not been, nor were they intended to be, a source of recovery
> for loss, cost or expense caused by disease-causing agents. With the possibility of
> a pandemic, there is concern that claims may result in efforts to expand coverage
> to create recovery for loss where no coverage was originally intended . . .

> This endorsement clarifies that loss, cost, or expense caused by, resulting from, or
> relating to any virus, bacterium, or other microorganism that causes disease, illness,
> or physical distress or that is capable of causing disease, illness, or physical distress
> is excluded . . .

71. The foregoing representations made by the insurance industry were false. By 2006,

the time of the state applications to approve the virus exclusion provisions, courts had repeatedly

found that property insurance policies covered claims involving disease-causing agents, and had

held on numerous occasions that any condition making it impossible to use property for its intended use constituted "physical loss or damage to such property."

72.    The foregoing assertions by the insurance industry (including Defendants), made to obtain regulatory approval of virus exclusion provisions, were in fact misrepresentations and for this reason, among other public policy concerns, insurers should now be estopped from enforcing the Virus Exclusion to avoid coverage of claims related to the COVID-19 pandemic.

73.    In securing approval for the adoption of virus exclusions by misrepresenting to the state regulators that such provisions would not change the scope of coverage, the insurance industry effectively narrowed the scope of the insuring agreement without a commensurate reduction in premiums charged. Under the doctrine of regulatory estoppel, the Court should not permit the insurance industry to benefit from this type of duplicitous conduct before the state regulators.

74.    Upon information and belief, Defendants have denied, or will deny, other Class members' claims for coverage under their "all-risk" property damage policies issued by Defendants.

75.    Defendants' denial of lost business income claims has left Plaintiff and the Class without vital coverage acquired to ensure the survival of their businesses during this temporary suspension of operations.

**<u>CLASS ACTION ALLEGATIONS</u>**

76.    Plaintiff brings this action individually and as a class action on behalf of the Class, defined as follows:

> All policyholders in the United States who purchased commercial property coverage, including business or interruption income (and extra expense) coverage from Defendants and who have been denied coverage under their policy for lost business income after being ordered by a governmental entity, in response to the COVID-19

pandemic, to shut down or otherwise curtail or limit in any way their business operations.

77.    Excluded from the Class are Defendants and their officers, directors, legal representatives, successors, subsidiaries, and assigns. Also excluded from the Class are any judicial officer presiding over this matter, members of their immediate family, and members of their staff.

78.    The members of the Class are so numerous and geographically dispersed that joinder would be impracticable. Class members are readily identifiable from information and records in Defendants' possession, custody, or control.

79.    There is a well-defined community of interest in the common questions of law and fact affecting the Class members. These common legal and factual questions include, but are not limited to:

        a.    whether Defendants owed coverage to Plaintiff and the Class;

        b.    whether any exclusions to coverage apply;

        c.    whether Plaintiff and members of the Class are entitled to damages and, if so, the measure of such damages; and

        d.    whether Plaintiff and members of the Class are entitled to equitable, declaratory and/or other relief, and if so, the nature of such relief.

80.    Plaintiff's claims are typical of the claims of the absent class members and have a common origin and basis. Plaintiff and absent Class members are all injured by Defendants' refusal to afford the purchased coverage. Plaintiff's claims arise from the same practices and course of conduct giving rise to the claims of the absent Class members and are based on the same legal theories, namely the refusal to provide insurance coverage for the loss. If prosecuted individually, the claims of each Class member would necessarily rely upon the same material facts and legal

theories and seek the same relief. Plaintiff's claims arise from the same practices and course of conduct that give rise to the other Class members' claims and are based on the same legal theories.

81.    Plaintiff will fully and adequately assert and protect the interests of the absent Class members and has retained Class counsel who are experienced and qualified in prosecuting class action cases similar to this one. Neither Plaintiff nor Plaintiff's attorneys has any interests contrary to or conflicting with the interests of absent Class members.

82.    The questions of law and fact common to all Class members predominate over any questions affecting only individual class members.

83.    A class action is superior to all other available methods for the fair and efficient adjudication of this lawsuit because individual litigation of the absent Class members' claims is economically infeasible and procedurally impracticable. Class members share the same factual and legal issues and litigating the claims together will prevent varying, inconsistent, or contradictory judgments, and will prevent delay and expense to all parties and the court system through litigating multiple trials on the same legal and factual issues. Class treatment will also permit Class members to litigate their claims where it would otherwise be too expensive or inefficient to do so. Plaintiff knows of no difficulties in managing this action that would preclude its maintenance as a class action.

84.    Additionally, the prosecution of separate actions by individual Class members would create a risk of inconsistent or varying adjudications with respect to individual Class members that would establish incompatible standards of conduct for Defendants. Such individual actions would create a risk of adjudications that would be dispositive of the interests of other Class members and impair their interests. Defendants, through their uniform conduct, acted or refused

to act on grounds generally applicable to the Class as a whole, making declaratory relief appropriate to the Class as a whole.

## COUNT I
## DECLARATORY RELIEF

85.    Plaintiff incorporates by reference each and every allegation set forth above.

86.    The Declaratory Judgment Act, 28 U.S.C. § 2201(a), provides that in "a case of actual controversy within its jurisdiction . . . any court of the United States . . . may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a).

87.    An actual controversy has arisen between Plaintiff and the Defendants as to the rights, duties, responsibilities and obligations of the parties in that Plaintiff contends and Defendants dispute and deny that the Policy provides coverage to Plaintiff for any current and future lost business income, subject to the limit of liability, for the temporary suspension of Plaintiff's operations.

88.    The Policy provides coverage for "direct physical loss of or physical damage."

89.    Plaintiff's loss of use, loss of access, and loss of functionality of the Covered Property when the Mandated Shutdown Rules made it unlawful for Plaintiff to fully access, use, and operate his business at the Covered Property, constitutes a loss to the Covered Property under the Policy.  Alternatively, the ubiquitous nature of the COVID-19 virus caused a loss to the Covered Property by preventing Plaintiff from using the Covered Property for its intended purpose.

90.    Additionally, the Mandated Shutdown Rules or, alternatively, the ubiquitous nature of the COVID-19 virus, caused a physical loss of or physical damage to property other than the Covered Property, thereby invoking coverage under the Policy's "Civil Authority" provision for

"actual loss of Business Income" when access to the Covered Property is prohibited by order of civil authority.

91.     Further, the Mandatory Shutdown Rules, or alternatively, the ubiquitous nature of the COVID-19 virus, caused physical loss or physical damage to Plaintiff's "dependent property," thereby invoking coverage under the Policy's "Business Income From Dependent Properties" provision, which provides for the payment of lost Business Income when a Covered Cause of Loss damages "dependent property."

92.     The Policy constitutes a valid and binding agreement obligating the Defendants to indemnify Plaintiff for covered losses.  Plaintiff has substantially performed or otherwise satisfied all conditions precedent to bringing this action and obtaining coverage pursuant to the Policy and applicable law, or alternatively, Plaintiff has been excused from performance by Defendants' acts, representations, conduct, or omissions.

93.     Defendants have failed to indemnify Plaintiff for its covered losses.

94.     No exclusion to coverage applies.

95.     Plaintiff has suffered and continues to suffer a covered loss under the Policy.

96.     Plaintiff, individually and on behalf of the Class, seeks a Declaratory Judgment that there is coverage for its business interruption losses under the Policy.

<u>**COUNT II**</u>
**BREACH OF CONTRACT**

97.     Plaintiff incorporates by reference Paragraphs 1 through 84 above as if fully set forth herein.

98.     Plaintiff and Defendants entered into a contract of insurance; here, the Policy.

99.     As an insurer, Defendants have a duty of good faith and fair dealing towards its insureds, including the obligation to pay for the financial losses suffered by the Plaintiff and members of the Class because of the Mandated Shutdown Rules.

100.    Plaintiff and members of the Class had a reasonable expectation that the financial losses suffered because of the Mandated Shutdown Rules would be covered under the Policy.

101.    The Class members entered into a substantially identical policy with Defendants.

102.    Under the Policy, Defendants agreed to indemnify Plaintiff and the Class for their business losses as a result of a covered loss.

103.    Plaintiff and the Class members suffered a covered loss under the Policy.

104.    Plaintiff and the Class members timely submitted a notice of claim and satisfied all conditions precedent to receiving the coverage it purchased from Defendants.

105.    Defendants breached their contract with Plaintiff and the Class members by failing and refusing to provide the contracted for coverage.

106.    Defendants' breach of the contract has caused Plaintiff and the Class to suffer damages in the amount of their unreimbursed business losses or their limits of liability, whichever is lower.

## <u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiff herein prays as follows:

1)      For a declaration that there is coverage under the Policy for the interruption to

Plaintiff's business and the associated business income lost therefrom;

2)      For damages, costs and attorneys' fees; and

3)      For such other relief as the Court may deem proper.

**TRIAL BY JURY IS DEMANDED**                   Respectfully submitted,

Date:   August 26, 2020                             */s/ Gary F. Lynch*
                                                    Gary F. Lynch
                                                    Kelly K. Iverson
                                                    **CARLSON LYNCH LLP**
                                                    1133 Penn Avenue, 5th Floor
                                                    Pittsburgh, PA 15222
                                                    P: (412) 322-9243
                                                    F: (412) 231-0246
                                                    glynch@carlsonlynch.com
                                                    kiverson@carlsonlynch.com

                                                    Howard M. Louik
                                                    **LOUIK LAW OFFICES**
                                                    750 Washington Road, Unit 705
                                                    Pittsburgh, PA  15228
                                                    P: (412) 889-7541
                                                    F: (412) 391-7310
                                                    howard@louiklaw.net


                                                    *Counsel for Plaintiff*